428 P.2d 439

**Nicholas GIACONA and Jane Doe Giacona, husband and wife, Appellants and Cross-Appellees,**

v.

**Joseph TAPLEY, as surviving Father of James Edward Tapley, a minor, Deceased, Appellee and Cross-Appellant.**

**No. 1 CA-CIV 383.**

Court of Appeals of Arizona.

June 12, 1967.

Rehearing Denied June 30, 1967.

Review Denied Sept. 26, 1967.

Gust, Rosenfeld & Divelbess, by Richard A. Segal, Boyd H. Gibbons, III, and Edward L. Morgan, Phoenix, for appellants and cross-appellees.

Mariscal, Goss, Green & Corbet, Phoenix, by Harry T. Goss, for appellee and cross-appellant.

STEVENS, Judge.

This appeal involves the application of the "attractive nuisance" doctrine in relation to the drowning of a child in a private, residential swimming pool.

In the early morning of 24 June 1963, Joseph Tapley arrived in Phoenix from Tulare, California, to attend the funeral of a brother. He was accompanied by his family, including his five year old son, James Edward Tapley. Three brothers and their families had congregated at the home of Robert Tapley, which home is located diagonally and across an alley from the home of the defendants, Mr. and Mrs. Giacona.

Robert Tapley's backyard was enclosed by a fence which had two gates, one leading to the alley and the other to the front of the house. The gate leading to the alley was secured on the day of the drowning.

The children in the families were playing in the Tapley's backyard. James Edward Tapley was given an apple and instructed to sit on the back door steps while he ate it. Five or ten minutes later he was missed. He was immediately discovered floating in the defendants' swimming pool along with his partially eaten apple. Efforts to revive him were unsuccessful.

The alley-side of the defendants' home was bordered by a wire fence and gate which was 45″ high at the gate. At a point visible from the Tapley home there was an opening in the oleander hedge and the fence was pushed down. There is a conflict in the testimony as to the height of the fence at that point immediately before the child drowned. Joseph Tapley testified that it was 12″ to 14″ when he entered the yard while looking for his son. Robert Tapley estimated it to be 10″ to 12″ "a reasonable time after the drowning". The officer who arrived shortly after the death estimated it to be 18″, but did not know if it was in the same condition when the boy entered the yard. Another officer, who visited the scene several hours after the accident, photographed the fence and measured it at 27¾″. Joseph Tapley looked at the photograph (Exhibit No. 6) at the trial and stated that the fence had been "pulled up by someone". Mrs. Giacona stated that the fence "wasn't broken down like that" before the drowning. Both defendants acknowledged that children and teenagers had gone over the fence on previous occasions.

All of the witnesses, except for the defendants, testified that the gate was unlocked. The defendants did not know whether or not it was locked but Mrs. Giacona stated that they "tried very hard to keep it secured".

Although James Edward Tapley was five years of age, he had progressed to the level of a four year old. He needed special attention and was supervised by his parents. He was watched by his parents but not "every minute". He, like other children of such tender years, was curious and "attracted to water, things that are pretty".

The plaintiff brought an action against the defendants, alleging attractive nuisance and negligence in the defendants' failure to erect and maintain a fence around their swimming pool as required by Section 506 of the 1962 City of Phoenix Code. A trial was held and a verdict was rendered by the jury resulting in a judgment in favor of the plaintiff and against the defendants for $4,300 plus costs. The defendants appealed. The plaintiff cross-appealed alleging that the trial court improperly excluded from the

consideration of the jury Section 506 of the City Code and instructions relating thereto.

The question of contributory negligence was submitted to the jury and resolved in favor of the plaintiff. This determination has not been questioned on appeal.

Section 339, Restatement of Torts Second, concerns itself with what is often termed the "attractive nuisance" doctrine. It provides:

"§ 339. Artificial Conditions Highly Dangerous to Trespassing Children

"A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

The Arizona Appellate Courts have not considered the application of the doctrine to private, residential swimming pools. In the recent California case of King v. Lennen, 53 Cal.2d 340, 1 Cal.Rptr. 665, 348 P.2d 98 (1959), the plaintiffs brought an action for the wrongful death of their son, who had drowned in the defendants' swimming pool. In holding that the complaint stated a cause of action, the court stated:

"As we explained in Garcia v. Soogian [52 Cal.2d 107, 338 P.2d 433, 435], * * * the question of liability must be decided in the light of all the circumstances and not by arbitrarily placing cases in rigid categories on the basis of the type of condition involved. We also pointed out in that case * * * that the circumstance that a condition giving rise to injury is common in character does not necessarily exclude liability, that the ability to appreciate danger varies with the age and mental capacity of the child, and that what is important is not whether conditions are common in character but whether their dangers are fully understood by children. * * * While a child is more likely to be aware of a dangerous condition which is common than one which is unusual, * * * it seems obvious that the common nature of a danger, such as that of drowning in a pool, should not bar relief if the child is too young to realize the danger. Even very young children cannot always be kept under the supervision of their parents, and the question whether a parent in a wrongful death case was guilty of contributory negligence in permitting his young child to play unattended near the defendant's property will ordinarily be for the trier of fact.

"A number of cases decided before Garcia v. Soogian, * * * reasoned that the 'attractive nuisance' doctrine does not apply unless the dangerous condition is uncommon and different from natural conditions which exist everywhere and that a body of water, natural or artificial, is a common danger and therefore, as a matter of law, will not subject the possessor to liability for the drowning of a trespassing child, even if that child is too young to appreciate the danger. (citing cases) This reasoning is inconsistent with the Restatement rule, and the cases cited above are disapproved insofar as their language or holdings are contrary to the views expressed herein."

The foundation case in Arizona on this subject is Salladay v. Old Dominion Copper Mining Company, 12 Ariz. 124, 100 P. 441 (1909). In that case a child was killed when she fell into the swift currents of the defendant's open and exposed mining flume. The court stated:

"* * * It is a matter of common knowledge that alluring and attractive flumes, such as the one in question in this case, carrying running water, are extensively used in this territory, not only by miners in the necessary and proper conduct of their business, but by farmers in the necessary diversion and application of the public streams to a beneficial use upon their lands in the cultivation of their crops. Not only flumes but irrigation ditches, large and small, similar in purpose, construction, and use, and equally dangerous and alluring to the child, are to be found throughout the territory wherever cultivation of the land is carried on, and such conduits, practically impossible to render harmless, are indispensable for the maintenance of life and prosperity. There is no distinction that properly can be drawn for liability for injuries received by a child from any of such various means of diversion or use of water. Both as a matter of law and as a matter of public policy we feel that the so-called 'turntable doctrine' should not be extended to cover such a case as is here presented."

Subsequent Arizona cases involved such conditions as: high voltage power lines, Salt River Valley Water Users' Association v. Compton, 39 Ariz. 491, 8 P.2d 249 (1932), rehearing denied, 40 Ariz. 282, 11 P.2d 839 (1932); blasting powder storage area, Buckeye Irrigation Company v. Askren, 45 Ariz. 566, 46 P.2d 1068 (1935); and automatic circuit breaker for a power plant, Downs v. Sulphur Springs Valley Electric Cooperative, Inc., 80 Ariz. 286, 297 P.2d 339 (1956).

The court approved the application of the doctrine in the Buckeye Irrigation Company and the Sulphur Springs cases. In Salt River Valley Water Users' the court indicated that the possessor might have been held liable, but found that the attraction was a bird nest on the steel tower supporting the lines and not the tower or lines themselves. In its opinion on the motion for rehearing, the court stated that the imposition of liability or safe standards is for the Legislature and not the court.

In MacNeil v. Perkins, 84 Ariz. 74, 324 P.2d 211 (1958), the court extended the doctrine and held that it is not necessary that the condition which causes the harm attract the child onto the premises.

In Marble v. Parham, 3 Ariz.App. 585, 416 P.2d 1006 (1966), where a seven year old child fell off a raft floating on the defendants' water hole, the Court held that the complaint stated a claim for relief. After citing a number of the attractive nuisance decisions in Arizona, the Court stated:

"We are impressed with the humanitarian trend in favor of the child which lessens the impact of the following statement contained in Salladay wherein the court observed that it was inclined to hold that the classic turntable decision of the United States Supreme Court,

'* * * does not reach cases where the danger is not only obvious, but where the object itself from which the danger arises is of such a character that, as has been said, "from the reason of the thing and the customs of the community the defendant was entitled to assume that the plaintiff's natural guardians would protect him from any dangers attached thereto as they easily could and ought to have done" '."

In the earlier Arizona cases, the court was dealing with industries and businesses which were vital to the economic growth and development of the state. The court was not favorable to the idea of placing excessive and prohibitive costs upon such producers and suppliers. Here, we are not faced with the same question. We are concerned with an inadequately fenced backyard swimming pool, the proper fencing of which would have imposed a slight burden upon the possessor. For this reason, we

will not speculate as to the outcome under a different set of facts.

We adopt the provisions of Section 339 of the Restatement of Torts and hold that the defendants are liable. This being the case, we will not consider the contentions of the plaintiff's cross-appeal relating to the violation of the City Ordinance.

Judgment affirmed.

CAMERON, C. J., and DONOFRIO, J., concur.