818 P.2d 158

Darrell TAFT and Deryll Taft, husband and wife; John B. Fowler and Valle Del Oro, a California limited partnership; Jack Compton Development, Inc., an Arizona corporation; and Superstition County Resort, an Arizona limited partnership, Plaintiffs–Appellants,

v.

BALL, BALL & BROSAMER, INC., a California corporation, Defendant–Appellee.

No. 1 CA–CV 89–435.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 21, 1991.

Reconsideration Denied April 9, 1991.

Petition and Cross–Petition for Review Denied Oct. 22, 1991.

Brown & Herrick by Bruce M. Squire, Mesa, for plaintiffs-appellants.

Crampton, Woods, Broening & Oberg by Terrence P. Woods and Neal B. Thomas, Phoenix, for defendant-appellee.

## OPINION

EUBANK, Judge.

This case involves a builder of a Central Arizona Project (CAP) Canal who allegedly diverted flood rainwater onto the real property of Darrell and Deryll Taft, John B. Fowler, and Jack Compton Development (appellants).

Taft, Fowler and Compton appeal from summary judgment in favor of Ball, Ball and Brosamer (BB & B), the builder, on the issues of strict liability, trespass, negligence and causation. We hold that summary judgment on the issues of strict liability and trespass was proper, but reverse the judgment on the issues of negligence and causation.

## FACTS AND PROCEDURAL HISTORY

BB & B contracted with the United States Bureau of Reclamation to build a portion of the CAP known as the Salt–Gila Aqueduct. Pursuant to this contract, BB & B was to construct a portion of the CAP known as Reach 1B. Reach 1B is located in southeastern Maricopa County. It begins northwest of University and Ellsworth Roads in the City of Mesa and continues in a southeasterly direction, terminating in the proximity of Meridian Road between Baseline Road and Southern Avenue.

The drainage area of the Salt–Gila Aqueduct above Reach 1B includes approximately 35 square miles of mountains and desert sloping generally to the southwest. Reach 1B runs perpendicular to the natural slope of the ground and intercepts the natural water courses.

The canal is bounded by earthen berms or levees. On the upslope side of the canal, the levee acts to prevent waters from flowing into the canal. There is a collector ditch on the outside of the upslope berm which runs parallel to the canal. When completed, the canal is designed to minimally interfere with the natural drainage of waters. This is accomplished by twelve overchutes and two flumes. The collector ditch will channel water to the overchutes. The overchutes then will carry the water over the canal and deposit it on the other side. The design and placement of these overchutes is intended to approximate the natural flow of water before the construction of the canal.

On about July 17–18, 1984, a severe rainstorm occurred in the East Mesa/Apache Junction region of Maricopa County. Reach 1B, while still under construction, filled to capacity and overtopped at its lowest point, flooding appellants' and other property. Twelve separate plaintiffs originally brought suit against BB & B, alleging strict liability, trespass and negligence. The cases were consolidated and BB & B filed motions for summary judgment on the issues of strict liability and trespass, and on the issues of causation and negligence. The trial court granted BB & B's motions on all four issues. Subsequently, all but three plaintiffs settled. The remaining plaintiffs appealed from the summary judgment on each of the four issues.

## I. STRICT LIABILITY

■ Appellants argue that *Schlecht v. Schiel*, 76 Ariz. 214, 262 P.2d 252 (1953) is controlling on this issue. In *Schlecht*, defendants constructed a wall which diverted the natural flow of water onto plaintiffs' property. In deciding the case, the court stated,

> [H]e may not cast the natural flow of a stream onto the land of his neighbor who is under no duty or obligation to receive the same. Negligence, wilfulness, or wantonness are utterly immaterial to the right to recover compensatory damages if plaintiffs' premises were not subject to an easement for the flow of the stream, and defendants did not divert the waters onto such premises as of right. The "wilfulness" required for recovery here is simply that the maintenance of the means of diversion be wilful, that it be the willed act of defendants; it is immaterial that they did or did not will the later damage that resulted.

76 Ariz. at 218, 262 P.2d at 256. *See also Bahman v. Estes Homes*, 147 Ariz. 432, 710 P.2d 1087 (App.1985); *Gillespie Land and Irrigation Company v. Gonzalez*, 93 Ariz. 152, 379 P.2d 135 (1963); *Maricopa County Municipal Water Conservation District No. 1 v. Warford*, 69 Ariz. 1, 206 P.2d 1168 (1949); *Maricopa County Municipal Water Conservation District No. 1 v. Roosevelt Irrigation District*, 39 Ariz. 357, 6 P.2d 898 (1932).

In reliance upon *Schlecht*, and the above cited cases, appellants argue that BB & B should be held strictly liable because it diverted the natural flow of water onto appellants' land and appellants were under no duty or obligation to receive the water. They further argue that because the act of building Reach 1B was wilful, it is immaterial that BB & B did not intend the resulting damage. Arizona law appears clear as to the application of strict liability in water canal cases such as this. Thus, we believe that BB & B is not subject to strict liability

because of the Arizona Supreme Court's reasoning in *Ramada Inns v. Salt River Valley Water*, 111 Ariz. 65, 523 P.2d 496 (1974).

In *Ramada Inns*, suit was brought against the Salt River Valley Water Users' Association and others for damage caused by flooding of the Arizona Canal. In determining that strict liability did not apply, the supreme court set forth two rationales. First, the continued utility and necessity of the Arizona Canal is "indispensable for the maintenance of life and prosperity." *Id.* at 68, 523 P.2d at 499. Second, the canal has taken on the characteristics of a natural waterway. *Id.* at 67, 523 P.2d at 498. We find both rationales persuasive, and thus controlling in this case.

Appellants focus on the word "continued" in the phrase "continued utility and necessity." They argue that because Reach 1B was under construction at the time of flooding, it has not been around long enough to be immune from the strict liability *Ramada Inns* afforded the Arizona Canal. We disagree. Arizona's practice of extending immunity to canals is long-standing. In *Salladay v. Old Dominion Copper Co.*, 12 Ariz. 124, 100 P. 441 (1909), a child died after falling into an open flume. The court held the attractive nuisance doctrine inapplicable, thus limiting liability for the operation of flumes and irrigation ditches as a matter of public policy.

> Not only flumes, but irrigation ditches, large and small, similar in purpose, construction, and use, and equally dangerous and alluring to the child, are to be found throughout the territory wherever cultivation of the land is carried on, and such conduits, practically impossible to render harmless, are indispensable for the maintenance of life and prosperity.

12 Ariz. at 129, 100 P. at 442.

In *Dombrowski v. Maricopa County Municipal Water Conservation District No. 1*, 108 Ariz. 275, 496 P.2d 136 (1972), a fourteen-year-old boy drowned in a whirlpool formed where defendant's canal emptied into a "stilling pool" used to slow the rate of flow. The court stated:

> This court has built upon and extended the *Salladay* decision to provide almost complete immunity to irrigation districts in Arizona in the maintenance not only of the canals and diversion points, but also various mechanical and electrical equipment needed to operate the water distribution system.

108 Ariz. at 276, 496 P.2d at 137.

The CAP, like other canals, is indispensable for the maintenance of life and prosperity in Arizona; therefore, we hold that immunity from strict liability extends to the CAP during its construction. The CAP enabling legislation clearly makes this point:

> The legislature declares and finds:
>
> 1. That the development of an adequate supply of water for agriculture, municipal, industrial and fish and wildlife uses within the state of Arizona is vital for the well being, health and prosperity of the people of the state.
>
> 2. That the state's right and obligation to receive two million eight hundred thousand acre feet of main stream Colorado river water annually having been confirmed by the United States supreme court in Arizona v. California, 376 U.S. 340 (1964) it is essential to the continued well being, health and prosperity of the people of the state that the state proceed promptly to establish, develop and execute an appropriate program for the development and utilization of such water.

A.R.S. § 45–1701. Public policy mandates that strict liability not apply in the construction phase of the CAP.

Second, appellants argue that the longevity of the Arizona Canal was the determining factor in deciding that it had taken on the characteristics of a natural water course, thus precluding the use of strict liability. It is true that the court in *Ramada Inns* made reference to the long-standing existence of the Arizona Canal as a factor in support of its decision, but the basic analysis is not dependent upon the longevity of the canal. The Arizona Supreme Court set forth three criteria to be considered in determining whether an arti-

ficial waterway can be considered a natural watercourse:

(1) whether the way or stream is temporary or permanent;

(2) the circumstances under which it was created;

(3) the mode in which it has been used and enjoyed.

111 Ariz. at 67, 523 P.2d at 498. These factors, applied to this case, also preclude strict liability. The CAP is a permanent structure, even though the portion in question was under construction at the time of flooding. The reason for its creation is to provide much needed water to the desert communities of central Arizona. Additionally, the manner of its use and enjoyment relates only to water transport, the same basic function of any water course. The CAP, like the Arizona Canal, brings with it the benefits and burdens of a natural water course.

For the foregoing reasons, we affirm the summary judgment on the issue of strict liability.

## II. TRESPASS

■ Appellants' claim of trespass is based upon *Restatement (Second) of Torts* § 158, "Liability for Intentional Intrusions on Land," which states in pertinent part,

One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he **intentionally**

(a) enters land in the possession of the other, or causes a thing or a third person to do so ... [Emphasis added.]

Nothing in the record supports the contention that BB & B intentionally caused the flooding of appellants' property. Because the requisite intent was not present, summary judgment on the issue of trespass was proper.

## III. NEGLIGENCE

■ Summary judgment is generally improper in negligence actions. *Boozer v. Arizona Country Club*, 102 Ariz. 544, 548, 434 P.2d 630, 634 (1968). It may be granted, however, if the record reveals that there is no genuine dispute as to any material fact, if only one inference can be drawn from the undisputed material facts, and if the moving party is entitled to judgment as a matter of law. Rule 56(c), Arizona Rules of Civil Procedure. "The primary duty of the reviewing court is to determine whether there is an issue of fact to be tried to a finder of fact. Where reasonable minds could reach different conclusions as to the existence of a genuine issue, summary judgment should not be granted." *Tribe v. Shell Oil Co., Inc.*, 133 Ariz. 517, 518, 652 P.2d 1040, 1041 (1982).

In the present case, reasonable minds could reach different conclusions as to the existence of a genuine issue of fact regarding negligence. An expert testified that after Reach 1B was completed, the canal could handle water from a three-hour, 100–year rainstorm. This same expert testified that, during construction, a canal should be able to handle runoff from rainstorms approximating a 25–year storm. The rainstorm involved in this case was approximately a three-hour, 20–year storm, yet the canal held only 40% of the total runoff collected in the canal. Thus, only 264 acre feet of runoff was stored in the aqueduct, while 405 acre feet of runoff overflowed the aqueduct, most of it flowing onto appellants' property.[1]

Additionally, reasonable persons could differ as to whether it was reasonable for BB & B to have all overchutes blocked off during construction of the canal. Concerning this issue, appellants argue that BB & B's contract with the United States to provide overchutes creates a higher standard of care on its part than that of reasonable care. We disagree.

---

1. While these facts and figures are disputed to some degree among various experts, we must accept the facts in the light most favorable to appellants. *City of Phoenix v. Space Data Cor-* *poration*, 111 Ariz. 528, 529, 534 P.2d 428, 429 (1975). The fact that these numbers are in dispute bolsters our decision to reverse summary judgment on the issue of negligence.

BB & B's contract with the government to supply overchutes creates no greater duty than the common-law duty of reasonable care. *Summitt County Development Corp. v. Bagnoli,* 166 Colo. 27, 43, 441 P.2d 658, 664 (1968). Nevertheless, on this record, it is our opinion that reasonable persons could differ as to whether it was reasonable for BB & B not to have provided overchutes during construction.

Further, reasonable jurors could differ as to whether it was reasonable for BB & B not to have taken some type of precaution to insure that water overtopping the canal would flow into a natural waterway rather than flooding private property. An expert testified that it was a reasonable plan to collect water in the canal in case of a storm, as long as a study was made as to where flood waters would overtop the canal and flow into natural water courses. BB & B knew the location of the lowest point of the berms and levees, yet did nothing to protect the private landowners over and above hoping that the canal would not fill to capacity and overtop before construction of the overchutes was completed.

Finally, there is a genuine dispute as to whether it was a premeditated plan on the part of BB & B to use the canal as a storage reservoir or whether it was merely an afterthought contrived during the course of litigation.

Thus, there are genuine issues of material fact upon which reasonable jurors could differ on the issue of negligence.

## IV. CAUSATION

■ While BB & B contends that it was not negligent, it alternatively argues that appellants have failed to show that the alleged acts of negligence were the proximate cause of appellants' injuries. In discussing whether the trial court properly granted summary judgment on the issue of causation, we start with the premise that

[t]he question of whether a defendant's negligence is the proximate cause of an injury is one of fact to be submitted to the jury and not a question of law for the court, if, upon all the facts and circumstances there is a reasonable chance or

likelihood of the conclusions of reasonable men differing.

*Hersey v. Salt River Valley Water Users' Ass'n,* 10 Ariz.App. 321, 326, 458 P.2d 525, 530 (1969).

In *Markiewicz v. Salt River Valley Ass'n,* 118 Ariz. 329, 576 P.2d 517 (App. 1978), the Salt River Valley Association argued that Markiewicz' damages were caused by an overtopping of the canal and not through the escape of water through the breaches as plaintiffs maintained. Consequently, it argued that Markiewicz' damages would have occurred despite the escape of water through breaches in the canal. The court stated:

If appellants would have suffered exactly the same damages in the absence of the Association's negligent acts, the Association would not be liable, obviously. Restatement (Second) of Torts, § 432(1) and Illustration 2 (1965). But if the Association's negligent acts were a cause of some part of appellant's damages, the Association would be liable for at least the damages it caused.

*Id.* at 338, 576 P.2d at 526. While the court conceded that overtopping the canal may have caused part of the damage, it concluded that a jury could easily determine that breaches in the canal could have also caused part of the damage.

Although the evidence was conflicting, a jury could find that the flood waters escaping the canal possessed greater volume and greater kinetic force than they would have had absent the Association's negligence, and that this contributed to appellant's injuries.

*Id.* at 339, 576 P.2d at 527.

In the present appeal, the experts agreed that appellants' land would have been flooded to some extent absent any construction on Reach 1B. It is also conceded that appellants have not shown a specific dollar amount of damage sustained over and above that which they would have received, absent the Reach 1B construction activity. But appellants have shown that they received a greater amount of water and a greater flow rate of water than they would have received absent the construc-

tion. An expert testified that "more water usually means more damage," and that "generally the flood damage curves[,] one develops[,] goes up with increased discharge."

As in *Markiewicz*, a jury could conclude that more water flowing at a greater rate contributed to appellants' damages. Therefore, in our opinion, there is sufficient evidence of causation in the record to preclude summary judgment on causation. For the above reasons, we reverse the summary ·judgment on the issue of causation.

## CONCLUSION

The public policy of Arizona requires that we sustain the trial court's summary judgment in favor of BB & B on the issue of strict liability. We also affirm summary judgment to BB & B on the issue of trespass. However, we reverse the summary judgment on the issues of negligence and causation, and remand for further proceedings consistent with this opinion.

JACOBSON, P.J., and EHRLICH, J., concur.