642 P.2d 885

Thomas HARRIS on behalf of himself and Hallie Harris, his wife, Plaintiffs-Appellees,

v.

BUCKEYE IRRIGATION COMPANY, Defendant-Appellant.

1 CA–CIV 5123.

Court of Appeals of Arizona, Division 1, Department A.

Feb. 11, 1982.

Rehearing Denied March 4, 1982.

Review Denied March 23, 1982.

Treon, Warnicke & Roush, P.A. by Richard T. Treon, Charles D. Roush, Arthur G. Newman, Jr., Andrews, Marenda & Moseley, P.A. by William S. Andrews and Dennis P. Turnage, Phoenix, for plaintiffs-appellees.

Jennings, Strouss & Salmon by M. Byron Lewis and Michael A. Beale, Phoenix, for defendant-appellant.

## OPINION

OGG, Presiding Judge.

This is an appeal from a judgment entered in a wrongful death action wherein the plaintiffs-appellees, Thomas and Hallie Harris (Harris) recovered damages from the defendant-appellant, Buckeye Irrigation Company (Company) for the wrongful death of their son, Marlon Harris, who drowned in the Company's irrigation canal.

The procedural history of this case is important because the resolution of the issues raised by this appeal are dependent, to some extent, upon the resolution of the first *Harris v. Buckeye Irrigation Company* case, 118 Ariz. 498, 578 P.2d 177 (1978). When this wrongful death claim was initially filed, the trial court granted the Company's motion for summary judgment on the basis of the *Salladay* doctrine granting immunity to Arizona irrigation districts in the maintenance of canals and equipment needed to operate the water distribution system. *Salladay v. Old Dominion Copper Mining Company*, 12 Ariz. 124, 100 P. 441 (1909). The sole issue in the appeal of the summary judgment in the first *Harris* case was whether *Salladay* and its progeny grant immunity to the Company in the defense of a wrongful death claim based upon the Company's alleged negligent construction and maintenance of a bridge over an irrigation canal.

The Arizona Supreme Court held that under the particular facts of this case, the *Salladay* immunity doctrine did not apply and stated:

> As this matter was decided on motion for summary judgment, all the facts were not developed. Assuming, however, that the judge or jury finds, after hearing all of the evidence at trial, that Marlon Harris fell from the bridge in question as the result of negligence on the part of the defendants or their employees in the building or maintenance of the bridge, we feel that under the peculiar facts of this case public policy does not require the application of the *Salladay* immunity doctrine.

118 Ariz. at 502, 578 P.2d at 181.

After remand back to the trial court, the wrongful death case was tried to a jury with a verdict returned in favor of plaintiffs Harris for $250,000 in compensatory damages and $180,000 in punitive damages. After the trial court denied the defendant Company's motion for a new trial or, in the alternative, for remittitur, the Company filed this appeal.

Two issues are presented for our review:

(1) Whether the trial court erred in instructing the jury that defendant owed a duty to Marlon Harris as an "invitee" rather than as a "licensee".

(2) Whether the trial court erred in submitting the issues of wilful and wanton conduct and punitive damages to the jury.

Marlon Harris, eleven years of age, fell from the Company's checkpoint bridge while on the way to the Little League baseball park on his bicycle. The bicycle was found near the bridge, and the body was located two miles downstream. The defendant, Buckeye Irrigation Company, has owned and maintained for "several generations" an irrigation ditch running through the town of Buckeye, Arizona. The ditch is twenty feet wide and the water in the canal runs up to a depth of eight feet. The ditch runs east to west and separates Valencia, a

residential area of approximately 500 to 700 people, from the main part of the city of Buckeye which is located south of the canal. The north side of the ditch borders on a Southern Pacific Railroad right-of-way and some privately-owned farmland; the south side of the ditch borders on the grounds of the Buckeye Union High School and a Little League baseball field. At a point near the Buckeye Union High School football field is an irrigation checkpoint consisting of three concrete pillars supporting a 24-inch wide board bridge across the irrigation ditch. This bridge was constructed to provide a method of access for employees of the Company to insert boards between the pillars to regulate the flow of water in the canal.

This bridge was also used by the public as the most direct method for pedestrians living in the Valencia residential area to cross the canal into the commercial-public section of Buckeye. Within the city limits of Buckeye there were two automobile bridges crossing the canal; the one to the east was 400 yards from the checkpoint bridge and the other one was a quarter mile to the west. The volume of grade school children alone using the bridge was estimated to be up to 150 children each school day, crossing at least twice a day. Wilbur Weigold, general manager of the Company, acknowledged that the children to his knowledge had used this bridge regularly for the past twenty to twenty-five years to get from one side of the canal to the other. There were no signs prohibiting use of the bridge, nor were there ever any gates or fences constructed to keep the public from using the bridge. A fair reading of the evidence indicates the general public was permitted to use the bridge and did use the bridge without any significant restriction.

A civil engineer testified that the bridge was not wide enough, that it had no handrails, that the walkway boards were not properly anchored, that there was a dangerous obstruction in the center of the bridge, that the surface of the bridge was uneven, and that the boards were warped and sagged. Based upon the foregoing, he concluded that the structure was "grossly unsafe".

It is undisputed that the Company had knowledge of prior accidents and was aware that another boy had fallen from the bridge into the canal approximately three months before the death of Marlon Harris.

## THE DUTY INSTRUCTIONS ISSUE

■ The Company argues that the trial court erred in instructing the jury that the defendant Company owed a duty to Marlon Harris as an invitee rather than as a licensee. The court, over the defendant's objection, gave the plaintiff's instruction 1, which reads as follows:

If an owner of property has permitted people to use or establish a way across his property under such circumstances as to create a belief that it is public in character, the property owner owes the same duty to such persons as he owes to persons he has invited to come upon his property.

An owner of property is liable for physical harm caused to people who come upon his property by invitation where such harm is caused by a dangerous condition on the property if the property owner:

(a) knows or by the exercise of reasonable care would discover the dangerous condition, and should realize that it involves an unreasonable risk of harm to such persons, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

This instruction is taken from the Restatement (Second) of Torts § 343 (1965).

The defendant Company argues that the trial court also erred in refusing to give the Company's "licensee" instructions 27 and 28. Company's proposed instruction 27 reads:

You are instructed that a licensee is a person who goes upon the land or premises of another by the express or implied permission of that other.

This proposed instruction is taken from Restatement (Second) of Torts § 330 (1965).

The Company's proposed instruction 28 reads:

> You are instructed that at the time of the accident the plaintiffs' decedent was what is termed a licensee upon the premises in question. In this connection, you are instructed that the owner or possessor of premises owes no duty to a licensee other than to refrain from wantonly or wilfully causing him or her harm. There is no duty to reconstruct or improve the premises for the purpose of making the premises more safe for such licensee. Therefore, if you find from the evidence that the defendants did not wilfully or wantonly cause harm to the plaintiffs' decedent then your verdict must be in favor of the defendants.

This proposed instruction was taken from *Hicks v. Superstition Mountain Post No. 9399, Etc.*, 123 Ariz. 518, 601 P.2d 281 (1979). The Company argues that *Hicks* governs this case and that the trial court here should have instructed that Harris was a licensee and not an invitee. We disagree. In *Hicks*, a member of the post's auxiliary slipped on a wet floor while assisting in the kitchen at a charity dinner held at the Veterans of Foreign Wars Post. The Arizona Supreme Court held she was neither a public invitee nor a business visitor, and that the Post was not liable for open and obvious dangers. *See* Restatement (Second) of Torts §§ 343 and 343A (1965). The factual situation presented in *Hicks* is dissimilar to that presented here.

In support of their position that the jury was properly instructed on the duty issue, appellees argue that the Arizona Supreme Court in the first *Harris* case held that if the jury finds the irrigation company (1) knew the public was using a bridge over a canal and (2) failed to exercise reasonable care to protect the members of the public when the bridge was negligently constructed and maintained, the irrigation company would be liable for injuries caused by its negligence. The Arizona Supreme Court, after discussing the facts as developed by the summary judgment appeal in the first *Harris* case, quoted with approval from *Olsen v. Macy*, 86 Ariz. 72, 340 P.2d 985 (1959), as follows:

> We find the law to be that if an owner or occupant of property has permitted persons generally to use or establish a way across it under such circumstances as to induce a belief that it is public in character, he owes to persons availing themselves thereof the duty due to those who come upon the premises by invitation. 118 Ariz. at 502, 578 P.2d at 181.

Although the Company contends the above statement quoted from *Olsen v. Macy* is mere dicta, it is our opinion that the statements quoted from the first *Harris* case and the *Olsen* case in this opinion are instructive as to the duty owed by the Company to Marlon Harris.

We also find the case of *Shannon v. Butler Homes, Inc.*, 102 Ariz. 312, 428 P.2d 990 (1967), to be instructive on this duty issue. In *Shannon*, a nine-year-old girl was injured when she walked through an Arcadia-style plate glass door. She was a guest in the home of the defendant at the time of the accident. The Arizona Supreme Court held that, although she was on the premises as a licensee, an occupier of property must adequately warn a child licensee against peril which the occupier may not reasonably assume the child to fully appreciate and which, because of the lack of appreciation, may constitute a hidden peril to the child. The court went on to further state that the characteristics of children are proper matters for consideration in determining what is ordinary care with respect to them, and there may be a duty to take precautions with respect to those of tender age which would not be necessary in the case of adults.

Applying the case law to the facts of this case, we find that the trial court did not err in refusing to give the Company's instructions 27 and 28 which limited the Company's duty to refrain from knowingly exposing Marlon Harris to a hidden peril or from wantonly or wilfully causing him harm. We find the trial court did not err in giving

the Harris' instruction 1 as a statement of the duty owed by the Company to Marlon Harris.

We further note that the Arizona Supreme Court did not attempt to label Marlon Harris as either a "licensee" or an "invitee" in the first *Harris* case. The court instead identified a particular factual situation in which it would be appropriate to hold a possessor of property liable for negligence. Here the trial court, following the first *Harris* case, in the context of the factual situation established by the evidence, determined that the Company must exercise reasonable care to protect children from a negligently constructed and maintained bridge it knew was used by children on a regular basis.

■ As a further basis for an affirmance on this issue, we find that the Company was not prejudiced by these instructions in light of the jury determination that the Company was guilty of wilful and wanton conduct. Conduct which supports the imposition of punitive damages is conduct which breaches the duty of care owed both to an invitee and to a licensee. Restatement (Second) of Torts, §§ 343, 341.

## THE PUNITIVE DAMAGE ISSUE

The Company objected to the trial court giving punitive damage instructions to the jury on the ground that there was no support in the record for an award of punitive damages. The Company further argues that in this appeal we must consider the facts in light of the law as it existed at the time of the drowning under the old *Salladay* immunity doctrine prior to the abrupt change in the law under the first *Harris* decision. The Company states that it properly relied upon previous decisions of the Arizona appellate courts and that it would violate public policy to now characterize such reliance as wilful and wanton conduct. The Company reasons that if the first *Harris* decision had not narrowed the *Salladay* immunity, there would be no duty owed to the Harris boy, and where there is no duty, there can be no wilful or wanton conduct.

■ Harris argues that even under the old *Salladay* doctrine, there was no immunity given for wilful and wanton negligence. Harris also contends that the public policy argument relative to the Company's reliance on the *Salladay* doctrine was never made to the trial court as a basis for an objection to these instructions and cannot now be raised for the first time on appeal.

Although the Company did not specifically make the public policy argument, it did generally object in a timely manner to the giving of the punitive damage instructions on the grounds that there was no support in the record or the law for an award of punitive damages.

Rule 51(a), Rules of Civil Procedure, 16 A.R.S., states in pertinent part:

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

Although this objection could have been more specific and detailed, it is our opinion that it was minimally sufficient to apprise the trial court and the party offering the instructions of the nature of the objection so the court could intelligently rule upon the objection. See *Southern Pacific Transportation Company v. Lueck*, 111 Ariz. 560, 535 P.2d 599 (1975).

The determinative matter for our resolution of this issue is simply whether there is evidence in the record to support the giving of the punitive damage instructions.

Again it is pertinent to return to the first *Harris* case and quote from a portion of that case wherein our Arizona Supreme Court stated:

Unfortunately, this immunity [*Salladay*] sometimes leads to the callous "public be damned" policy exemplified by the testimony of the manager of the defendant irrigation company in the instant case. The statement of the manager that it was "not my responsibility to see that everything on our canal system is safe for anybody's use" and that he is only con-

cerned with the safety of his employees and not anyone else's, is the direct result of the belief by the irrigation company that because of *Salladay, supra,* it had absolute immunity from suit.

118 Ariz. at 502, 578 P.2d at 181.

 Viewing the facts, as we must, in a light most favorable to upholding the jury verdict, *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297 (1977), we find there was evidence to support a determination by the jury that the Company acted with reckless indifference to the safety of Marlon Harris. Accordingly, the trial court properly instructed on punitive damages. In this regard we note there are no Arizona cases holding that the *Salladay* doctrine grants immunity for wilful and wanton conduct. *See Dombrowski v. Maricopa County Municipal Water Conservation District, No. 1,* 108 Ariz. 275, 496 P.2d 136 (1972); *Hersey v. Salt River Valley Water Users' Association,* 10 Ariz. App. 321, 458 P.2d 525 (1969).

Our review of the record discloses that ample evidence was presented that the Company knew the bridge was dangerous and that children and the general public used it on a regular basis. Additionally, it was established that the Company knew there had been prior accidents on the bridge because of its dangerous condition. Yet it is apparent that the Company exerted no meaningful effort to warn, improve, or close the bridge. To determine wanton negligence, the acts of the defendant must be considered as a whole, and although several acts standing alone may not exceed the bounds of ordinary negligence, cumulatively they may establish wanton negligence when considered together. *Southern Pacific Transportation Company v. Lueck, supra.* When appellant's acts and conduct are considered as a whole, we conclude that an instruction on punitive damages was warranted. We further conclude that the jury's award of damages was proper and that the trial court did not err in denying appellant's motions for new trial or remittitur.

CONTRERAS and CORCORAN, JJ., concur.